Filed 10/22/13  In re Mary B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re MARY B., a Person Coming Under the Juvenile Court Law. | |
| | D063696 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ13869) |
| v. | |
| ROBERT W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Suzanne F. Evans, under appointment by the Court of Appeal, for Minor.

Robert W. appeals the juvenile court's order refusing to return his daughter, Mary B., to his custody at the 12-month review hearing. (Welf. & Inst. Code, § 366.21, subd. (f).)[1] Robert contends the court's finding that returning Mary to his care would cause a substantial risk of detriment to the child was not supported by substantial evidence. We affirm.

FACTUAL BACKGROUND

Mary is the daughter of Robert and T.B.; the couple never married, but dated for one and one-half years.[2] Because Robert, who had legal and physical custody of Mary, lived with the paternal grandmother in a senior citizen community, Mary resided with T.B. most of the time.

On December 2, 2011, the San Diego County Health and Human Services Agency (Agency) filed a dependency petition on behalf of Mary, then three years old, alleging she was exposed to domestic violence. (§ 300, subd. (b).) The petition also alleged Mary previously had been a dependent child and her parents were uncooperative in the current investigation.[3]

---

[1]     Statutory references are to the Welfare and Institutions Code.

[2]     T.B. is not a party to this appeal. She had filed a notice of appeal, but she failed to file a brief after she was given notice pursuant to California Rules of Court, rules 8.412(d)(1)(A) and 8.416(g). We dismissed her appeal on July 31, 2013. We will refer to T.B. only as relevant to issues presented in Robert's appeal and to provide background.

[3]     When Mary was born, she tested positive for amphetamine, which resulted in her first dependency case. T.B., who admitted using diet pills during the pregnancy, did not participate in reunification services, but Robert did. After Robert obtained stable housing, Mary was placed with him. In July 2009, the juvenile court awarded Robert sole physical and legal custody of Mary and terminated jurisdiction. T.B. was given supervised visits.

According to Mary, Robert had hit T.B. with a closed fist; at one point, Mary hid under the covers of her bed because she was scared. Robert and T.B. had a history of physical altercations in Mary's presence.

On February 24, 2012, the juvenile court sustained the dependency petition, removed Mary from parental custody, placed her in foster care and ordered reunification services for Robert and T.B. The court also ordered unsupervised visits for Robert and T.B. on the condition they visit Mary separately. Robert's case plan called for him to complete a domestic violence course and participate in therapy.

Robert participated in services, but was not complying with the order of having visits with Mary separate from T.B.'s visits.

In July, Mary was placed with a nonrelated extended family member (NREFM). Robert, as well as T.B., frequently asked the new caregiver to extend visitation beyond that authorized by Agency.

On September 19, Robert began overnight visits with Mary.

The social worker initially recommended additional services and continued out-of-home placement for the six-month review hearing, but changed her recommendation to placement with Robert because he was compliant with his case plan and his visits were going well. At a hearing on October 12, the juvenile court directed minor's counsel to contact Mary and report back to the court.

On October 23, the social worker changed her recommendation again because of Robert's increasingly aggressive and angry behavior toward T.B. and the caregiver, who now feared for Mary's safety. Agency filed a section 388 motion, seeking to have the parents'

3

separate, unsupervised visits be changed to separate, supervised visits. The motion alleged Robert and T.B. had been visiting together and Robert had been allowing T.B. to have overnight visits, which had not been approved because she had not made progress with her case plan. The motion also alleged: "Parents are still unable to set boundaries with each other and minor. They continue to subject their daughter to potential volatile situations and have not demonstrated they can protect [the] child."

The caregiver related a mid-October incident in which Robert drove to T.B.'s residence, blocked the caregiver's vehicle in which Mary was traveling, yanked Mary from the vehicle and took her into T.B.'s residence. Robert then grabbed T.B.'s sleeve, pulled her close to him and said, "I told you I didn't want that piece of shit around my daughter (referring to [the caregiver])." The social worker recommended Mary remain in out-of-home care and the parents' visits be supervised.

The six-month review hearing was continued several times and was finally concluded in January 2013. Agency withdrew its section 388 motion. The court found returning Mary to either parent would create a substantial risk of detriment. Mary was continued as a dependent in out-of-home care and placed with the same NREFM. The court ordered unsupervised visits for Robert in his home only.[4]

For the upcoming February 12-month permanency review hearing, the social worker recommended that Mary remain in out-of-home care and the parents continue to receive reunifications services. The social worker said Robert continued to create situations for

---

[4] Robert appealed the court's order, which this court affirmed in *In re Mary B.* (2013) 218 Cal.App.4th 1474 (*Mary B.*).

negative interaction with T.B. in Mary's presence. Both parents continued to violate court orders.

In March, the caregiver said she noticed a positive change in Robert over the previous six weeks. He was pleasant and polite, and Mary returned from visits with him in a positive and energetic mood. Robert's service providers also reported he was dealing better with his anger. However, T.B. reported Robert had been verbally abusive to her on the phone; he called her a moron or stupid. Robert denied calling T.B. stupid, but may have said that certain things she wanted to do were stupid. Robert also said he had ended two phone conversations with her so that he could calm down rather than display his anger.

The social worker acknowledged Robert had made positive changes and recommended overnight visits with Mary. The social worker told Robert he needed to obtain day care for Mary so he would not be tempted to drop her off at T.B.'s residence when he went to work.

At the April 2 hearing, the social worker testified that Robert had selected a day care center. Once Mary was enrolled in day care, the social worker planned to transition the child to Robert's care. The social worker opined it would be detrimental to immediately place Mary with Robert because he had not yet shown he could follow Agency's strict guidelines. The social worker said Robert needed to demonstrate he could set boundaries with Mary and not accede to her wishes to visit with T.B. because the child was crying. The social worker recommended Robert receive overnight visits with Mary. The social worker said the success of those visits should be assessed before Mary was returned to Robert's care.

Before ruling, the court noted the case was a difficult and frustrating one because of a pattern of progression and regression by the parents.[5] The court continued Mary in out-of-home care after finding that return of Mary to either parent would create a substantial risk of detriment. The court ordered overnight visits for Robert and authorized Agency to begin a 60-day trial visit after verifying day care was in place and the development of a safety plan for sharing information about Mary with T.B, and for exchanging the child during her visits with T.B. The court found Robert had made substantive progress with his case plan.

DISCUSSION

Robert contends the evidence was insufficient to support the juvenile court's finding Mary could not be safely returned to his custody. The contention is without merit.

Section 366.21, subdivision (f), which governs 12-month review hearings, provides in pertinent part: "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." Agency bears the burden of establishing detriment. (*Ibid.*)

---

5       The court observed: "Both parents will participate in services, and then suddenly this case will just turn on its head. [¶] The information that once appeared to be reliable and solid is nothing more than quicksand, and that's not just on one particular point this time. It's a recurring theme breeding the frustration. The father was very close to getting his daughter here recently. And then we come to find out that he has taken advantage of all overnights that were being offered and enmeshed in a relationship with the mother that drew her in, and things got out of hand, and anger just erupted, and people felt threatened and scared. [¶] That's serious. That can't just go away because you want it to go away. It's serious. People's lives change because their perception of their safety because of the aggressiveness that may or may not be there, but certainly is perceived to be there. And [Mary] is not immune from that. She is a very intelligent, intuitive four year old, and she picks up on that a lot."

"[T]he risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).) Although the court must consider the parent's progress in services, "the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) "Even if the parent has 'largely complied' with his or her reunification plan and some evidence justifies return of the child, the court must look to the totality of the facts, including the parent's progress, and may find that return would be detrimental if those facts warrant such a determination." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2013) Periodic Review Procedures, § 2.151[5], p. 2-460, citing *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 703-711.)

We review the court's detriment finding for substantial evidence. (*Yvonne W.*, *supra*, 165 Cal.App.4th at pp. 1400-1401.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) On appeal, the parent has the burden of showing that there is no evidence of a sufficiently substantial nature to support the court's finding. (*Ibid.*)

Substantial evidence supported the court's detriment finding. Although Robert had made substantive progress with his case plan, he had shown poor judgment throughout the dependency, including the month preceding the hearing. Despite having identified T.B. as a

7

trigger to his anger, he continued to have phone conversations with her, which were a source of irritation for each of them. Whether Robert called T.B. stupid or called her actions stupid is a distinction without a difference; the abusive nature of the communication is apparent regardless of the semantics. Moreover, Robert did not disclose the conversations to the social worker, who pointed out to him that it might be better to communicate with T.B. about their daughter through e-mails or by texting rather than by talking directly to her. Thus, while Robert had taken steps to control his anger, there was substantial evidence he had not yet resolved the problem—at least with respect to T.B. Hence, the risk of harm to Mary's emotional and physical well-being in this coparenting situation remained.

Additionally, Robert had yet to demonstrate that he would not continue his pattern of bringing Mary to T.B.'s residence and leaving her there during *his* visits, when T.B. was not authorized to have Mary in her care. Even though Robert had obtained day care for Mary, Agency wanted to first assess Robert's behavior with overnight visits before recommending Mary be returned to his custody. This was reasonable in light of the history of this case. Earlier, when Robert had overnight visits, he dropped her off at T.B.'s residence. The juvenile court is entitled to consider the totality of the circumstances when making decisions concerning the child. (*In re Chantal S.* (1996) 13 Cal.4th 196, 201.)

As we paraphrased the court's ruling at the sixth month review hearing, "while Robert had exhibited positive change, it was too soon to say whether he had actually changed. As a result, there remained a substantial risk of harm to Mary should she be returned to Robert's care." (*Mary B.*, *supra*, 218 Cal.App.4th at p. 1484.) Three months later, there was substantial

8

evidence it was still "too soon" to declare the risk of detriment to Mary had been eliminated. (*Ibid*.)

Robert's reliance on *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322 (*Jennifer A.*), *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 (*David B.*) and *Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495 (*Rita L.*) is misplaced. These cases are distinguishable because the parents in them had completed their case plans to the extent that the issues that led to the removal had been resolved. In contrast, here Robert still had problems relating to the underlying domestic violence.

In *Jennifer A*., the minors were removed from their mother's custody because she had left them alone on one occasion when she went to work. (*Jennifer A.*, *supra*, 117 Cal.App.4th at pp. 1326, 1328.) Substance abuse was not alleged in the petition as a reason for removal, but the mother, who admitted she occasionally smoked marijuana, tested positive for marijuana once and missed nine out of 95 drug tests. (*Id*. at pp. 1326, 1343.) Otherwise, the mother was in compliance with her case plan and had made " 'substantive progress' in court-ordered treatment programs addressing the problems" that led to the dependency. (*Id*. at p. 1344.) After finding that returning the children to the mother's custody placed them at risk because of her missed drug tests and the positive test for marijuana, the juvenile court terminated reunification services and set a section 366.26 hearing. (*Jennifer A*., at p. 1340.) The appellate court disagreed and issued a writ of mandate. (*Id*. at p. 1347.) Although the mother's missed and positive drug screens raised concerns, the appellate court found that because there was no evidence linking the mother's marijuana use to her parenting judgment or skills and the

dependency petition did not raise drug abuse as a ground for removing the children from mother's care, the lower court's ruling was not supported by the evidence. (*Id*. at p. 1346.)

*Jennifer A*. is not helpful to Robert. The issue in *Jennifer A*. turned, in large part, on the fact that evidence of mother's drug use did not support the allegation of neglect in the petition, which was based on her leaving the children alone while she went to work. Here, however, Robert's remaining anger problems with T.B. and his questionable ability to abide by court orders and visitation guidelines were directly related to the issues that led to the dependency.

In *David B*., the father had no contact with his infant child after her mother disappeared with her. (*David B*., *supra*, 123 Cal.App.4th at p. 772.) When the child was two years old, she was detained from the mother's care. (*Id*. at p. 774.) The father was unable to take custody of the child at the time because he was unemployed and had no fixed residence. (*Id*. at p. 775.) The father moved in with his sister and her family and, at the social worker's direction, had made an effort to prepare that residence for his child. (*Id*. at p. 793.) During 18 months of reunification services, the father did "virtually everything" the social services agency had requested of him, "and then some." (*Id*. at p. 772.) At the 18-month hearing, however, the agency pointed to evidence that the sister's husband had once committed an act of domestic violence against his own daughter, and faulted the father for failing to move out of his sister's residence and establish his own. (*Id*. at p. 785.) After father conceded he currently had no other housing, the juvenile court concluded, among other things, that there was a risk of detriment in placing the child with her father while he remained at his sister's residence. (*Id*. at p. 773.) The Court of Appeal disagreed, noting a risk to the child had not been shown and the record showed the agency had never informed father it would be necessary for him to obtain

10

another residence to gain custody of his child, and it had not provided him with any assistance to make such a change.  (*Id*. at pp. 773-774, 793.)

The facts in *David B.* are profoundly different than those presented here.  First, unlike here, the child was not removed from *the father's care* in *David B.*; he had no history of either domestic violence or child abuse.  Second, the father in *David B.* showed none of the resistance and resentment toward reunification shown by Robert in this case.

In *Rita L.*, the child was detained at birth due to prenatal exposure to amphetamines and alcohol.  (*Rita L.*, *supra*, 128 Cal.App.4th at p. 498.)  The mother fully complied with her case plan, the social worker recommended returning the child to the mother, and the juvenile court told the mother that her performance during the reunification period had been exemplary.  (*Id.* at p. 506.)  However, after the mother took a Tylenol with codeine tablet, which had been prescribed for her adult daughter, to relieve a headache; she tested positive for the drug.  (*Id.* at p. 502.)  Based solely on the positive drug test, the juvenile court terminated mother's reunification services.  (*Id.* at p. 506.)  The Court of Appeal reversed, holding that the single positive drug test by itself was insufficient to support the conclusion that the child could not be returned to mother when mother had no history of abusing prescription drugs, and there was no evidence that the one incident was likely to lead the mother to backslide into more serious drug use.  (*Ibid*.)  The facts in *Rita L.* bear no resemblance to the facts in this case.

## DISPOSITION

The order is affirmed.

IRION, J.

WE CONCUR:

HUFFMAN, Acting P. J.

O'ROURKE, J.